All right. We'll call the first case. Case number 14-0857, Jane Doe v. Township High School District 211. Will the attorneys that are going to present oral argument please step up and identify yourselves for the record. Good morning, Your Honors. Michael Kujawa on behalf of the defendants' appellants. Mr. Kujawa. Good morning, Your Honors. Jack LaHanne on behalf of Jane Doe. With me is Lynn Dowd, my colleague on the brief. And trial counsel are also present, Mr. Goldman and Ms. Maserati. All right. Good morning, Mr. LaHanne. Each of you will have approximately 15 minutes to present oral argument. And from that, Mr. Kujawa, you may save some time for rebuttal. Sure. Can I save five minutes for rebuttal? Yes. Yes. All right. I'll retreat. Yes. All right. Mr. Kujawa, you may proceed. Thank you, Your Honor. Before you start, I have a couple of questions for you. Sounds good. All right. Your firm has been here many times. Yes. And I consider your firm one of the better defense firms in the city. Well, thank you. But what I don't understand is in your brief here, you didn't give us a complete table of contents. You didn't have an appendix. In the appendix, there was no notice of appeal. Why is that? I thought we had provided a complete table of contents, Your Honor. And if we did not, I apologize for the oversight. And in the appendix, I thought we had placed everything in there that needed to be in there. I mean, even in your statement, for standard of review for each issue with citations, I didn't see that in your brief either. I did that in a ready ball job. So go ahead. Thank you, Judge. We're here today to discuss the application of the attorney-client privilege and work product privilege under Supreme Court Rule 201 as it applies to the personal, handwritten investigation notes of District 211 current superintendent and at the time director of special education, Dr. Dan Cates. When everything came to light in this case with the arrest of Christopher Girard in early October 2005, Dr. Dan Cates, who at the time was the director of special education, was asked by, requested by his boss and another member of the control group at District 211, the superintendent at the time, Roger Thornton, to conduct an investigation into what happened with an eye towards culpability and legal responsibility on behalf of the district. Okay, but in this investigation, this investigation included a number of statements that were taken from various witnesses and people. Isn't that true? I would have to disagree with that, Your Honor. I don't believe Dr. Cates took any statements from anyone. What he did was he talked to people, he interviewed them, he wrote down his thoughts and impressions and some notes, took down some. Well, in his notes, he put down what they said, didn't he? I think he put down his summarization or interpretation of what they said, but none of the notes that were taken are verbatim. They're not statements such as you would say, okay, give me your statement, I'm going to take it down, I'm going to hand it back to you, I'm going to ask you to review it. You can make changes to it if you want, if you feel I took it down incorrectly. You can amend it, you can add to it. There's none of that. What we have here is Dr. Cates writing down in his own hand his thoughts and impressions as he interviews various people for the intent of coming back and providing his interpretation, his thoughts, the results of his investigation, to the control group at District 211, the superintendent, Roger Thornton, the associate superintendent, Dave Torres, and to legal counsel, myself. I have a question. Why did they ask Dr. Cates? Why did his superiors ask Dr. Cates to conduct the investigation instead of giving it to someone within the district itself? Well, he is within the district itself. Well, you know what, I mean someone within the hierarchy within the district. Because Dr. Cates was the director of special education, so everything that occurred in this case occurred in the special education department at Hoffman Estates High School. All of the children involved were special education students. All of the teachers and staff were going to fall under Dr. Cates' line of supervision as the director of special education. So because of his unique and specialized knowledge of special education, they asked him to conduct the investigation? Yes, because he was the highest person in the district. And when you talk about his role as the director of special education, he's probably in the top four people within the district at the time that this is happening. He would actually report it directly to Roger Thornton, the superintendent. The associate superintendent was there because he's involved in all litigation issues anyway. And then there's Dr. Cates who's involved in all of that stuff as well, in particular in this case because it was all involving the special education program. So at the time Dr. Cates was conducting his investigation, he knew the reason why he was doing it and the reason why was to report back to the control group. And you can see from the nature of these notes, they are not the type of thing that's going to be placed into the school records. And, in fact, everything that was in the official school records involving all of the students was produced in discovery in this case, including various e-mails from Dr. Cates regarding the placement of the girls after the fact and all those other things. All of the official actions of Dr. Cates as it relates to the students who are involved and the teachers was produced in discovery. The only thing that was not that we withheld were his handwritten personal notes because they originated in confidence. He was told, go out and find out this information so you can come back and report to us, the control group and our attorney, what we're looking at here as we anticipate litigation. Well, is there anything, there's no language of any kind like that in this report. Is there even his introductory notes? Well, as you can, the notes themselves are just scribbles on yellow paper. There's no suggestion of these thoughts or contemplations in this anywhere written down. In Dr. Cates' notes? Anything, yes. You mean his, the instructions that he was given at the time in terms of what you're going to do in terms of what he actually put pen to paper? He didn't say anything like what you just suggested. Well, he didn't think he had to at the time. He was just taking down notes. I mean, he wasn't going to create, that's why no reports were created. This was something that he did for his own personal use in conducting his investigation so that he could report to us. It was certainly not anything that was intended to even make copies of and distribute to the control group. It was so that he could use them and inform the members of the control group and the attorney as to what his findings were. And so they were originated in confidence. They were only disclosed to the superintendent and the associate superintendent and his attorney, and they've remained confidential up until today. And so, unfortunately, the order by the trial court to disclose these notes was, I think, based on a misinterpretation of the Consolidation Coal case. Because when you look at the notes and compare it to the Consolidation Coal case, these are clearly both attorney-client and work-product privilege documents. If you look at the Consolidation Coal case, Judge Gillespie in his ruling said, well, I think these notes are like the Saylor report, and that's the last name of the gentleman in Consolidation Coal who did the metallurgical report. But that was an objective testing that was done, sort of liken it to an accident reconstruction or something like that, where they developed objective evidence, and that's why in that case that objective evidence was not considered to be work-product or attorney-client privilege. What about the issue that he started conducting these interviews and taking down these notes way before the litigation even started? How does that make it work-product? Well, I was brought into the case a day or two after the arrest of Chris Gerard. At the time that the student was arrested and they began to realize what was happening, and one of the things you have to remember here is there were sort of two investigations going on, if you will. There was an investigation at the high school level that was conducted before I was involved or before I talked to any of those people, and it started with the principal and the assistant principals. And we disputed the claim of the privilege on those notes, and Judge Gillespie overruled us and we turned over the notes of those people. Judge Gillespie's feeling at that time was that was a fact-finding investigation that would have been done whether or not litigation was going to happen because something happened at the school and the principal wants to find out what happened, and so she tasked her associate principals with going out there and doing that investigation. This is a different animal here when we're talking about the district level. The district knew from the moment this thing happened that it was very likely, and they were correct. As far as an attorney-client privilege, you've argued two theories, work-product and attorney-client. Yes. As far as the attorney-client, is there any case that you would suggest really supports this? I mean, we know that it doesn't have to be an attorney. It can be an insured. What other case would you suggest is even close? This is not according to the insurance company. I mean, there's really no case such as this where a school administrator began taking down notes and conducting an investigation, and that was held to be first, you know, the attorney-client privilege. I don't know that there is effectually a case directly on point. That's why I think when you look at the cases that are closest to it, you've got to look at the Consolidation Coal and Lenarski, maybe, in the sense that it was. Let's say, like in the federal court case that we cited, the Sandra T.E. versus Berwyn case, where the district had gone out and hired a law firm to come in and conduct this investigation. Right, right, hired a law firm. Or hire an investigator. But why would they have to do that when they have? But there isn't a case that describes or suggests, hires an investigator. We have an attorney that we would understand. We have cases extending it to the insured, insurer rather, statements to the insurer. Sure. But we don't have anything like this, do we? Well, if you look at the, I think the Rapps case, Rapps versus Kelderman's case, is an analogous case in terms of the insurer maybe not doing it themselves, but hiring an investigator to do it for them with the idea that we don't go, I mean, when you talk about the insurer, the insurance company is going to have somebody. But it doesn't necessarily have to be an employee of the insurance company. It can be someone that they retain to do it. And I think the fact that we have other cases where, like Lenarski, where we have the risk management coordinator who does the investigation. Now, she's an employee of the defendant in the case. They didn't hire an outside counsel. They didn't go hire an outside investigator. But it was the company itself that had their own employee do it. And she took down her memos and notes of interviews. And the court in that case said it's the equivalent of the attorney notes in consolidated coal because you have summaries of conversations, but they're not verbatim. They're not reviewed. They're not adopted or altered or signed by the witnesses. And this is the type of thing that certainly the information that Dr. Cates obtained, the factual information, which is interspersed within his notes. He wrote down facts. But it's mainly his impressions and theories and his opinions about that. And that's the distinction here is when we talk about it's the opinion versus the fact. That's why the Saylor report in consolidation coal was discoverable, but the notes and memos were not. And therein lies the distinction here. But Dr. Cates at some point is going to get deposed in this case. In fact, every single person who Dr. Cates would have talked to during his fact-finding investigation done in anticipation of litigation is part of this case. The plaintiffs disclosed 42 separate witnesses from the district. Here's the basic problem with your argument. And I used to do that for a living. I was an insurance adjuster. I made the same argument you did as a lawyer many times. The problem is it's the statements that are given by people. That stuff has always been discoverable. It's always been discoverable. And when you integrate it with somebody's opinion, even if those opinions are utilized in trial strategy, you run afoul of the law. Because if you're going to have somebody who's going to give you impressions, the impressions should be in a separate document from where the statements are. They should be segregated. And then when you talk about the video that you have here, when you try to say that the video is a work product or privileged, the video, if you want to use it in court, the other side has the right to see it. If we intended to use it in court, sure. Okay. Well, then certainly if the plaintiff hasn't viewed the video, she can't argue anything because she hasn't seen it. And impossibility is always an exception to the work product doctrine. You agree to that, don't you? Impossibility in the case of consolidated coal? Sure, a possibility of obtaining the information. But plaintiffs came to the school and walked through the school, took photographs, can take videos, they can come back and do any of that at any time they want. It's not impossible for them to secure video of the school. No, but it's not privileged. The plaintiff has the right to see the video. They're going to be used in court. The plaintiff has the right to see the video. But they're not going to be used in court, Judge. Well, that's another story. That's another story. I think when we talk about the video, it's similar to the Shields v. Burlington Northern Santa Fe case in which the court talked about surveillance videos. And you may have to turn those over if it's a surveillance video because that provides objective evidence that the plaintiff cannot get any other way. But this is not objective evidence that the plaintiff cannot get any other way. And on the video, there's audio as well of Dr. Cates sort of talking, saying, well, this is what I'm looking and this is why I'm doing it. And that's what makes it work product and attorney-client privilege because who is he talking to? As he said in the affidavit, I made the video specifically for the purpose of coming back and showing it to the control group, to the superintendent, to the associate superintendent, and to my attorney. Well, I think you're mistaken. If you're going to use something in court, the other side has the right to see it. I agree, Your Honor. If we are going to use something in court, the other side has the right to see it. We don't get to hide things from them and spring them on them later on. That's not what we're doing here, though. Because impossibility, you see, is always an exception to the work product act. So, you know, in order for somebody to argue impossibility, they have to be able to see what they're talking about. Well, Your Honor, if that was the case, then you'd never be able to assert the work product doctrine because they'd always say it was impossible and then you'd have to see it. It works with the videos. That's what the law is on videos. But I also think we're sidestepping the attorney-client privilege here. And the video is different in the sense that, you know, if you look at the Shields Burlington Northern case where they talk about they made them turn over the video after they removed the audio portion of it because the audio portion did contain some of the thoughts and impressions and theories of the person who took the video. And so they said, well, you've got to give up the objective evidence, but not the non-objective evidence. Well, on this whole work product issue, too, the whole – first of all, it's considered to be broader than the attorney-client. Yes. But the idea behind it is to protect the right of an attorney, generally speaking, to thoroughly prepare his case and to preclude a less diligent adversary attorney from taking undue advantage of those efforts. I mean, how do you translate this information that was prepared well in advance of any Well, first of all, I would have to disagree with the assertion that it was prepared well in advance of the attorneys being called in. Okay. Well, take that part out. Okay. How was this designed to protect the right of an attorney to thoroughly prepare his case? Where do you have that in these facts? Because it's not just the attorney. What if a defendant wants to defend themselves pro se? But is there any indication that that's what Dr. Cates was trying to do, prepare a case for the attorneys? That's exactly what he stated in his affidavit. Okay. In his affidavit, but not when he actually took the notes or when he prepared the video. There was no indication of any of that legal CAD or anything in the tape suggesting that, was there? There certainly was nothing in Dr. Cates' notes which said, he didn't write attorney-client privilege and work product on the top of there. No. Right. I understand. But I think if we look at Supreme Court Rule 201, what it says is the work product applies to material prepared by or for a party in preparation for trial. So whether or not it's an attorney or the party themselves, the work product doctrine applies and the privilege applies. And the arrest in this case took place on October 5th of 2005, and this started at that time. And I was involved in this case in working with Dr. Cates and Dr. Thornton and Dr. Torres at October 6th, October 7th. I was on the phone with them in terms of what was going on and what they were doing. So they knew from the get-go that this was going to be work product and anticipation of litigation, prepared for litigation, and it was all going to be attorney-client privilege. And it has remained that way. All right. I have a question. As you indicated earlier, Dr. Cates is the director of the special education. Yes. All right. And he has a unique knowledge and experience and expertise in this area for the district. Yes. Okay. So how do you distinguish the fact that he was asked to conduct this investigation because of his unique knowledge and experience, and he was really fulfilling his role as director of special education. So how do you distinguish that in terms of him doing a fact-finding based on really what his job was supposed to be in terms of investigating an issue with special education as opposed to conducting an investigation that becomes work product for an attorney? I mean, isn't he really just doing his job as director of special education for the district? I think, again, we get back to the distinction between the investigation done at the school level and what Dr. Cates did at the district level. And District 211 is the largest high school district in the state of Illinois. They've got five very large high schools. There's all sorts of staff. And so the fact that that's why the investigation was done at the school level, that is the type of investigation that's going to be done in a normal situation where you have an incident between students or involving students, that's going to be done at the school level and maybe reported up to the district as to what the findings were. This was a completely different case. This was a case where they knew, based on the nature of the allegations and what they were hearing, that there was going to be litigation. And that's why this was done well out of the norm, done in anticipation of litigation, and done by a member of the control group. So if they knew that, then why did they just bypass Dr. Cates and just give it directly to the attorney to conduct the investigation? Well, they wanted Dr. Cates to conduct that investigation based on his knowledge of the people involved. But wouldn't there have been a nice, clean line of demarcation if this whole thing were just turned over to you? Certainly it would have been better in hindsight, in retrospect. But I don't think that affects the application of attorney-client privilege or work product, especially when the rule says material prepared by or for a party. So there's nothing limiting a party from conducting their own investigation. We know from the Consolidation Coal and Molinarski cases that in-house people, and they don't even have to be attorneys. In Molinarski, it's a risk management coordinator. They can conduct these investigations. Otherwise, then everybody's forced to, because we want to have a clear line of demarcation, we have to go hire an attorney every time to conduct it, and we have to isolate our people. That's not what the law contemplates or requires when we look at Supreme Court Rule 201. Two things. Your opponents say that we should just dismiss this for failure to comply with Supreme Court rules, not consider the issues on the merits. And then, finally, they say that if we do vacate the contempt order, we shouldn't vacate the fine. Why don't you briefly address those, and then you can have some time for rebuttal. Thank you. Well, first, I'm not sure what Supreme Court rules they're saying we violated here. I think one of the things they're trying to say is, well, you can't, it's, the record is insufficient for you. Yeah, the record is insufficient. Sure. The record is not insufficient. You've been given everything that was in the amended privilege log and everything that Judge Gillespie ruled on, and I think the orders are clear as to what he ruled on. Now, I will say this. In our, we should have been more specific in our briefs in terms of the use of the 157 pages of Dr. Cates' notes, because that is not a clear and fully accurate representation of what Dr. Cates actually wrote. What it really is, as you've seen, you've got 144 pages of Dr. Cates' notes. There's 12 pages of one of the assistant principal, Tim Little's notes, and one email from Dr. Thornton, which those were all turned over after the privilege log was filed, but before Judge Gillespie did his in-camera inspection. You know, on that issue, we had to read all of those notes because nothing in this brief tells us anything about those notes, really, just conclusions. Well, I understand that, but if we summarize the notes, you know, we sort of- You could have done a job in there to put them in categories or something to help you make a better record. That's all I can say. I understand what you're saying, Judge, but I also think there's concerns about the more information you place into the record on what the content of the notes, the further you weaken your claim of work product privilege and attorney-client privilege. So it felt like a catch-22 situation for us on that. As far as the- So I think the record is clear on what Judge Gillespie was ruling on, what he ordered us to turn over. And it's the 144 pages of Dan Cates' handwritten notes minus- Judge Gillespie took out the nine pages that were identified by page number in the second affidavit of Dan Cates, which were direct-his notes of direct attorney conversations he had with me and or the representative from the insurance company, Mike Nugent, who's listing the record. So that takes you down to really 135 pages if you're removing those. But it's 144 pages total. So I don't think there's any question as to what Judge Gillespie reviewed and ruled on and ordered us to turn over and what we, therefore, thereby refused to turn over so that we could get here for consideration by the appellate court. And that takes me to the second issue regarding the contempt citation and the fine. There was, like a lot of things in this case, a bit of a convoluted procedural history. Just in getting to this point, counsel for the plaintiff has said that we weren't acting in good faith when we tried to challenge this order. And I think if you look at the record, the ruling by Judge Gillespie, it's clear he didn't think we were acting in bad faith. He felt we were in good faith in what we were trying to do. We notified the attorneys for the plaintiff within six days of the court's order. And so we still had eight days in which to actually turn over the documents, but we notified them within six days of the court's order that we did not intend to comply with the order, that we intended to seek a finding of friendly contempt by the court so that we could have this issue. You know, on the issue of friendly contempt, I lecture on that all the time. It's very, very important to put in the order the word friendly contempt. Because otherwise, you see, there happens to be rules as to what is friendly contempt. And one of those rules is it's a case of first impression. This is not a case of first impression. You see, that's the problem. But if you put in the word friendly contempt, then the appellate court doesn't have to look further. I noticed that yesterday, Judge, when I reread my order, and I did not put the word friendly in there, which was, I was kicking myself. We have to find friendly contempt somehow. Well, I think it is in the report of proceedings from the hearing that Judge Gillespie said that they're looking for a finding of friendly contempt. It's also in the record in the correspondence between us and plaintiff's counsel saying, we're going to ask for a finding of friendly contempt. If you want to speed the process up by filing a motion to hold us in contempt, have at it. But we intend to do it, and we're letting you know right now what it is we intend to do. So I hope I've answered your question, Judge. And I saved a couple minutes, I hope, for Ripple. Certainly. All right. We'll hear from Mr. Lehane. Thank you, Your Honors. I would like to start out by clarifying, I think, a question on the timeline that counsel mentioned in his argument. He mentioned that Girard was arrested on October 5th and that he was involved on, like, October 6th or 7th. I believe, at least according to the privilege law, which is all I've seen, the earliest notes of Dr. Cates are dated September 20th and September 21st. So this is significantly before Girard is arrested. And it's also even before one of the special ed teachers, Ms. Zidek, was first notified of what grew into the incidents resulting in Girard's arrest. That's her contention, her answers to interrogatories, that she didn't know anything until she was told by one of the parents on September 21st. So we already have, according to the information that we have in the privilege law, Dr. Cates, the special ed director, conducting an investigation into what the special education students and faculty were doing and not doing and seeing and not seeing. You suggest that since one of the things you suggest is that he was doing what was just his job. I would think so. But can it equally be argued that he was doing this in terms of work or as fitting into the attorney-client privilege in terms of for a party? The school district eventually is a party, aren't they? Obviously the school district is a party, and I can't argue with that. So if it fits into both, why wouldn't the privilege apply? Well, it doesn't apply for a couple of reasons. One is the timeline that we've just discussed. He's doing this because it's his job to do it, and he's doing it before Girard is arrested. He's doing it before Mr. Kajawa is retained, and I'm sure that Mr. Kajawa was retained early on, as he says, because that's what he says. But it's still a couple of weeks into this investigation. So, again, if you want to try and cloak this with some sort of immunity, what the Seventh Circuit did in the Sandra T.E. case, they said, well, Sidley and Austin was brought in, and they were given not just a fact find, but also to make proposals to the district. This is how we're going to prevent this situation from arising in the future. We're going to discuss policy changes. They went to the retention letter, if you'll recall, and went down that whole line there. We've got none of that here. We've got the special ed director doing the special ed director's job. Something happened on his watch, and he has to find out what happened. What about their argument that he's doing this in anticipation of litigation? They realize, the district realizes there's a possibility there may be litigation. In today's society, almost everything can be in anticipation of litigation, Your Honor. I don't know that, you know, is it possible, is it likely even, that when mentally disabled students are raped by a classmate under the noses of teachers who are supposed to be taking care of them, that there might be litigation? Yeah. Yes, of course. But, you know, is it also the job of the school district to provide protection and an adequate learning environment and a safe place for these girls to go to school? Yeah. So we have both. We have a conflict here, and if they want to try and separate them out, they have to do something more than was done here. That would be my response. Well, would you agree that the impressions by the investigator are not discoverable? Which investigator and when? Dr. Cates is not just an investigator. If there was an investigator who was retained, if you want to talk about raps, you know, or something like that, that's a totally different thing. Well, wasn't Dr. Cates clothed as an investigator? Well, can you put a different costume on him and say, well, now, you know, he's somebody else that he is already? And that's what you're asking me. Can we put a different, you know, can we put a mask on him now and say, now he's an investigator even though he is still the special ed director and that's still his job to figure out what happened, and he's still got to take care of this situation in his district under his watch. So I don't know that you can just put a hood on somebody or a mask on somebody and say, oh, now you're an investigator, you're protected. I don't think you can do that. So you think his impressions are discoverable? Well, here, I believe, I don't know what's in these materials because obviously I haven't seen them. Well, counsel just argued that he has impressions in there as to what his impression was. I believe that if he has specific responses to inquiries from counsel, if there are such things in there where he's referencing that, that's probably going to be privileged. I understand that. But beyond that, no, I really would kind of dig my heels in a little bit. I don't think that that's appropriate under the circumstances in the context of where this man is. Well, he wasn't really tasked with anything like give us your impressions. No. At least not from the superintendent. We don't know exactly what the superintendent said from the privilege log. We don't know exactly what was directed in terms of anything. The privilege log is very generic. It says he made a fact-finding mission. It doesn't even say he was doing it for an attorney. It doesn't even say that he was going to share it with the assistant superintendent or the superintendent or the assistant principal. It says it was personal and kept in his file and under lock and key and never shared with anybody. What about that? It's a moving target. Did he designate them as personal notes and that they were not school records or school notes or anything of that official designation? You know, in the mythical school permanent record, yes, I understand that this would not be in the school's permanent record. But it's still something that he's done as a school employee in the course of doing his school job. Certainly these notes are discoverable, I would think. On a different vein, let me ask you this question. When you come in on a motion to obtain discovery, don't you have to comply with Supreme Court Rule 201 and say that you attempted to resolve the dispute with opposing counsel? Yes, although there is a case from this court, and don't ask me to remember the name off the top of my head, it begins with a G, that says that once you have case management conferences, it applies here, once you have prior rulings on discovery, we no longer have to go through the entire 201K process. And the reason for that is at that point it becomes an empty exercise. If you've had the initial point where the court has intervened and the trial court has intervened and said, okay, we've got a conflict here, you do this, you do that, and it doesn't happen and the trial court continues to intervene, we don't have to have separate 201K. Well, did you ever file a 201K? At any time, I couldn't find one in the pleadings. I don't think that there was a separate pleading. Certainly there's nothing marked in the record as a 201K, a report of a 201K conference. I can tell you that. Wouldn't that have been the obligation of our friendly contemnor? Am I missing something? I would think it would be if he's going to raise the objection that there was a problem with 201K. But like I said, I don't believe that 201K actually has any application. Here. Or even in the trial court. Once the trial court has intervened in discovery. All right. And the case will come to me tonight. The other point I wanted to talk about, because you raised it, in terms of what we're asking the court to do today, we are asking the court to dismiss the appeal because of the uncertainty in what's been ordered. And we did try, and counsel's clarified a little bit of that here today, or he's attempted to, I think, trying to tell us what it is that the trial court actually ordered. As appellate counsel, I'm looking at the orders and trying to interpret them and understand them. And I wasn't entirely certain myself, and I was trying very hard to understand what it was that Judge Gillespie had ordered. But isn't the hearing transcript in the record? The hearing transcript is in one hearing transcript, the only one. And that hearing transcript, as the court may have noticed, is really over whether or not this should be considered a motion for sanctions, which is what trial counsel brought, or whether it should be a motion for friendly contempt, which is what the. But not the reasons why the court was allowing the evidence or the matters to be discoverable? At this point, we're several weeks past the ruling on the turnover. And now, you know. And the turnover order you're saying isn't in the record either, the order that Judge Gillespie entered? The turnover order is in the record. It's confusing if you try. There's a couple of paragraphs that seem to contradict each other. Names have been crossed out and so forth. What I'm saying is that the court's reasoning for, you know, these pages shall be turned over, that's not in the record. We don't have that. The other thing that I'm saying is that, you know, that also goes to the incompleteness of the record. And, you know, it's a matter of if this court doesn't have a sufficient record on which to evaluate what the trial court did, then it more or less, you know, is stuck. It has to dismiss the appeal. The other question is one of Rule 17 compliance, which I haven't, you know, I raised that in the brief. And I don't know, I mean, I saw, obviously, in going through the record, that there's a sealed envelope in the supplemental record, the one volume, that was sealed up for appellate court use only, and obviously it remained sealed during the entire time it was in my possession. I gather from comments made by the court today that that envelope has been opened and been looked at. I don't believe that there was ever a motion filed in this court to permit documents to be filed under seal pursuant to appellate court Rule 17. Now, if I'm wrong, I apologize. But that was my understanding from inquiring that there was no such motion. I didn't see it addressed in the reply brief. So my concern is that that's not properly, necessarily, before the court either. The court has the power, certainly, to review it. I don't deny that. The other argument on the merits goes to compliance with Rule 201N. And counsel indicated some concern about, well, what rule do we say was violated? What 201N specifically says, you must specify the privileged claim. If you're going to claim a work product or you're going to claim attorney-client privilege, you've got to say so in your privilege log and you have to describe what it is. And you say they didn't really claim work product. They didn't claim it at all. They said they didn't specify any privilege whatsoever, attorney-client, work product, or anything. So there is no privilege claim whatsoever in any of the amended privilege logs. And there's a number of them in the record. The last most is in the record at RC 9430 through 9443. There's a generic description on each one. So those are the reasons why we ask for either a dismissal or an affirmance. Either way, I believe it would leave the contempt order in place and would leave the turnover order in place and require these matters to be resolved in the trial court. The courts raised the question of whether or not the contempt finding should be vacated.  The notice of appeal was filed on behalf of the school district and on behalf of counsel. And while I understand that it's traditional for counsel to wear the jacket on these kinds of cases and take one for the team, that was not the order entered in the trial court. The trial court did not enter an order against Mr. Kujawa personally. The trial court entered an order against the school district and the principal and the two teachers who are defendants in this case. So the principal and the two teachers, Mr. McNamara, Ms. Zydek, and the principal, Ms. Bush, are not even here. I don't know how this court can vacate the contempt finding as to them when they're not here asking for it to be done. The school district is here, and obviously Mr. Kujawa, I don't know how you can vacate something against him that was never entered. So the only one we're talking about is the school district. My thought on the vacation of this is in the cases that I've read, when you ask for a friendly contempt citation, basically by the time you get to that point, the trial judge knows it's coming, opposing counsel knows it's coming, everybody knows it's coming. It's like, Judge, you know if you do this, I can't go there. And it's not you, it's me, it's my client, I can't do this. That's where you get a friendly contempt citation. The judge says, well, I've explained my reasons and this is what I want you to do, and if you tell me you're not going to do it, I'm going to enter this order and we'll go from there. That's how you test it. Here, the order is entered, time passes, then we get a letter saying, you know, we've decided not to comply. And if you want your depositions, you better not ask for this information. And by the way, if you want to bring a motion, go right ahead. I dare you. Now, he didn't say I dare you. You have the letter. But the point is that that's not consistent with the kinds of behaviors that we ordinarily see in these cases where the court vacates the contempt citation. We didn't have that here. This is a case that is now almost nine years old from the time it's been filed. We're talking about events that occurred almost a decade ago. Gerard was arrested, as counsel told you, on October 5th, 2005. It's a long time. And these high school girls who were 13, 14, 15 years old are now in their 20s. It's been a long, long time. We ask that, under the circumstances, it would not be inappropriate. And I mean no disrespect to Mr. Kajawa, and I mean no disrespect to his firm. I certainly have the greatest reverence for Mr. J. Judge. But I would ask that, in this case, the contempt citation not be vacated. Thank you. Let me ask you this. You're talking about contempt. You know, contempt is a willful act by somebody who doesn't want to comply with the court order. Contempt is not a situation where a lawyer believes that certain documents are work brought and he wants a determination by a court. Someday you may be in the same situation. When you have a contempt order against you as a lawyer, you'll never be able to become a judge because the Bar Association will never approve you of that. It goes on your record, and it's not a wonderful thing to have. See, the situation could be turned around. There may be some day where you may be in the same situation as this lawyer. Your Honor, there but for the grace of God, Gawai is inscribed on my heart. No argument with you on that. Do you really believe that this lawyer, who is a good lawyer, did this in a willful manner, that he didn't do it to protect his client's interest? Do you really believe that? What I believe is that there is no contempt citation against Mr. Kajawa to vacate. We'll have to clarify that. He's not in trouble here. I disagree with you. Your brief refers to him as a contemptor appellant. Right, and I also refer to him as a volunteer. We will clarify that. And I appreciate that. Thank you, Your Honor. I think Justice Gordon's point is well taken. If the order is against Mr. Kajawa, then I think it warrants serious consideration of whether or not it should be vacated. But if he is not the subject of the order, then we'll have to make that clear in our decision as well, and that if we choose to vacate it as far as the school district, that's another entirely different matter. And we'll clarify it one way or the other. Thank you, Your Honor. All right. Mr. Kajawa, do you believe the order was entered against you? I think the order was entered against the district alone. Because in this case, Dr. Cates is, well, now he's the superintendent of the district. He was at the time that the order was entered. The other individual defendants, Ms. Bush, Ms. Zydek, Mr. McNamara, they can't waive the district's attorney-client privilege or the work product privilege that Dr. Cates engaged in. So they're not a part of this right now. This is the district, an individual defendant, raising this particular privilege. And in terms of the order itself, I think it was against the district, but I'm the one representing the district and I'm the one advising them. But that's why I think the court agreed with the order that it was just the district, because it's their privilege that's being asserted. Ms. Bush, Zydek, McNamara, they have nothing to do with this. I wanted to touch on a few things. But here, let me ask you this one question. I believe the record will show that the defendants asked the court to hold them in contempt and their counsel. Well, if you look at the cases which talk about ‑‑ No, I'm just talking about what was said in this case. Yes. And you as their counsel. Sure. And because you look at the Norskog and all the cases which talk about the procedure for taking this case or situation like this up on appeal under Rule 304B5 is the fact that you have to come in and ask for a friendly contempt order. I am the one refusing to turn over the documents. I'm the one there saying we're not judge. With all due respect, I am not going to comply with your court order. So how that shakes out in terms of who the actual contempt order is against, if it's against me, then it's against me. If it's against the district, it's against the district. And it can be against all of you. What's that? I think here it's against all of you. I don't know how it could be against the three individual defendants in the sense that they are unable to ‑‑ acting on behalf of the control group of the district. Well, it's because I think that's what you asked them to do, to hold the defendants in contempt. And if that is what I asked, well, then I asked incorrectly, Judge. Well, okay. I'll learn in the future. Hopefully I don't have to go through this too many times. What is your response to Mr. Lahane's suggestion, or argument rather, that you failed to comply with 201N? 201N in terms of the ‑‑ Not specifying any privilege or work product. Well, see, in the amended privilege law that was filed with the court and given to them, we indicated that all of the documents were personal notes of Dan Cates, Director of Special Education, regarding his personal fact‑finding mission and to the alleged events, including but not limited to conversations with various faculty and staff members and his thoughts and impressions regarding SANE. They were created for his exclusive use and benefit, were not distributed to any 30 parties, were made in anticipation of litigation, and were kept in his personal file at District 211. Does that specify that this was attorney‑client privilege or work product? I thought it did at the time. And I thought that it was the language of both attorney‑client privilege and work product. I didn't think that that was ever an issue. As far as in Judge Gillespie's mind, what was being argued in front of him? And I think the report of proceedings is very clear. I know we only have one transcript, and it's the transcript from the finding of contempt. But what Judge Gillespie is clear on in his ruling is that he was relying on consolidated coal, and he felt that these notes were fact‑finding, similar to the Saylor report under consolidation coal. A couple points I want to make. I want to also clarify. You agree with Mr. Lahane that 201K has nothing to do with this, that there wasn't a need for you to indicate or both of you indicate that you had tried to reach a consensus as far as the discovery being requested. Well, I think that goes to the timeline that Mr. Lahane was talking about. We were trying to ‑‑ I thought we were trying to work it out. Is 201K in any way an issue here? That's all I'm asking. I don't believe that 201K is an issue. Okay, that's all I wanted to know. We did try to. The timeline, as Mr. Lahane pointed out, though, is a bit incorrect in the sense that I notified plaintiff's counsel that we intended to not comply with the order and we were going to look for a finding of friendly contempt. And then the very next day I got notices of depositions for the witnesses that would be implicated in some of this stuff. And so I was confused by that. I wasn't sure if he was saying ‑‑ I think the timeline that Mr. Lahane was directing us to was that in September there was this suggestion. You're right. And possible ‑‑ And I can address that. Whatever. But then the arrest didn't occur until, what, months later? It occurred on October 5th of 2005. And if you look at the affidavit of Dr. Cates, it says that his role in this began in October of 2005, began after the arrest. But his notes began before that, didn't they? His notes are about things that occurred in September of 2005. It doesn't mean he began his investigation in 2005. But, again, this goes to the nature of the fact that these are personal notes and not reports that were created in order to place into the school records. They were his personal notes. And he hadn't ‑‑ everyone at the school and the district, other than maybe the one teacher, which is a really separate issue, they had no idea that anything was happening at the school prior to the arrest. And so although Dr. Cates has notes in his ‑‑ or has notations within his notes indicating September 20, September 21, and things that occurred prior to his beginning his investigation, that's because what he's noting is things that occurred on those dates, not when he took those notes. And so that's why. But if Dr. Cates is saying that he created these notes for personal reasons and personal growth, how could they be privileged? How could they be privileged? Personal notes. Well, when we talk about personal notes, it's not as though he just decided on his off time he wanted to conduct an investigation into this incident so he could write an article about it or write a book about it later on. He began this investigation because he was, number one, called into the superintendent's office and said, hey, we have a problem. I'm bringing in the associate superintendent and I'm calling the attorney and we need to start our investigation and you're going to go do it.  It was completely in anticipation of litigation. And the only reason we keep referring to personal notes is because we're trying to distinguish between the personal notes that many educators generate when they're doing this as opposed to the official school records. Every single, every administrator that I've talked to, school district administrator that I've talked to in this case, when they find out that their personal notes are discoverable, like the principal and the assistant principals in this case, they say every single education course I've ever gone to says that our personal notes are not part of the school records and are not discoverable. Why do we have to turn these over? To decide that the personal notes of Dan Cates are going to be discoverable and not protected by work product and attorney client in this instance is going to have a major chilling effect on the way school districts operate. Well, there really wasn't any case law out there suggesting that schools or school districts in doing this sort of thing when a complaint is made and somebody has to look into it, that those are privileged. There's not even any relevant authority that even says that right now. You're comparing this to the expansion of the privilege, certainly beyond an attorney to the insurer. But, I mean, in terms of case law, there wasn't anything out there that says we're going to be putting a chilling effect on something that doesn't even really, it's not even there. We'd be saying something new here, I think. I don't think so. I think what you'd be saying is that we're certainly extending some case law. I think the only reason, the only extension would be that this involves a school district and the director of special education as opposed to the individual who worked for Bekris Erie in the Consolidation Coal case and wrote their notes and memos. I don't think that every time something may occur in a school district where suddenly there's a complaint made and the school has to look into it, that means whatever we do from here on out is privileged. I don't think that that's anywhere in any of the cases we have right now. If you respond or investigate a complaint because you have an obligation under multiple layers of legislation, district policy, and district rules, then suddenly anything you do is all, it meets the test for attorney-client privilege and work product. So in terms of your suggestion about a chilling effect that this court entered or that we might affirm, I just don't go with that one. Your Honor, if you look at where we drew the line in the sand here, we didn't draw the line in the sand at the principal's personal notes and investigation that she did at the school level or the assistant principal's. What we drew the line at is we're saying, okay, now we're leaving the school where everything happened. Now we're going to the district, going to the district level, and we're going to oversee five or six different schools, and we're way up there in the control group. That's why this is outside the norm. Was Dr. Cates the department head? Wasn't he the head of the special education of this particular school? Not of the school district. Yes, there were people who were in charge of special education at that school. All right. And they would report to the principal at that school, and the principal would then report to the people at the district level. Okay. And that's where we drew the line. That's why when we got to the district level, we didn't refuse to turn over the notes of the principal in their investigation because, quite honestly, we didn't feel attorney-client work product would carry the day in that argument. But when we got to the district level and we talked to our client and we talked about the fact that this is someone who's clearly in the control group, who clearly started this in anticipation of litigation at the behest of the school superintendent and hand-in-hand with the attorney who was hired to defend the case, how can that not be attorney-client privilege and work product, and you have to draw the line somewhere? And that's why we drew the line in the sand there and refused to comply with the order. All right. And so I would ask that this court reverse Judge Gillespie's decision requiring us to turn over these documents and that it would vacate the contempt finding against whoever it applies to. Whoever it applies to. Yes. All right. Thank you, Your Honor. Thank you. Thank you both. Thank the attorneys. The case was well-argued, well-briefed, and we will take it under advisement. We will take short recess. We're going to reconfigure our panel for the next oral. Court is adjourned.